**WATERGATE EAST, INC.,
et al., Petitioners,**

v.

**PUBLIC SERVICE COMMISSION OF
the DISTRICT OF COLUMBIA,
Respondent,**

**Washington Gas Light Company,
Intervenor.**

**No. 94–AA–147.**

District of Columbia Court of Appeals.

Argued Nov. 8, 1994.
Decided Sept. 25, 1995.

---

Michael R. Postar, with whom Wallace L. Duncan, Thomas L. Rudebusch, and David H. Cox, Washington, DC, were on the brief, for petitioners.

Daryl L. Avery, with whom Edwin E. Huddleson, III, Washington, DC, was on the brief, for respondent.

Douglas V. Pope, with whom John K. Keane, Jr., Excetral K. Caldwell, and L. Patrice Latimer, Washington, DC, were on the brief, for intervenor.

Before WAGNER, C.J., and TERRY and KING, JJ.

TERRY, Associate Judge:

Petitioners seek review of two orders of the District of Columbia Public Service Commission. The first order granted a request by the Washington Gas Light Company to change the utility rate design for its customers in the group of high-rise buildings known as the Watergate, and the second order denied petitioners' motion for reconsideration. Petitioners offer several arguments for reversal. We reject them all and affirm both orders.

## I

Petitioners are the owners and managers of a group of six buildings in Northwest Washington—three cooperative apartment buildings (Watergate East, Watergate South, and Watergate West), two office buildings, and a hotel—that are collectively known as the Watergate complex, or simply the Water-gate. *See Watergate Improvement Associates v. Public Service Comm'n*, 326 A.2d 778, 781 n. 1 (D.C.1974). The extensive heating and cooling facilities in these buildings are powered by a steam and chilled water service furnished by the Washington Gas Light Company (WGL). In providing this service, WGL uses natural gas, and on limited occasions fuel oil, as its fuel for the steam and chilled water plant located in the Watergate East building. In addition, WGL operates and maintains that steam and chilled water plant, which serves all the Watergate buildings.[1]

In the District of Columbia, all WGL customers fall into one of three categories: "firm" gas customers, "interruptible" gas customers, and "steam and chilled water" customers.

> Firm customers are customers whom WGL supplies with natural gas. Interruptible customers are customers whom WGL supplies with fuel; for any given period, this fuel may be, in WGL's discretion, either natural gas or a substitute fuel (usually oil).... Steam and chilled water customers are customers whom WGL supplies with steam and chilled water. The Watergate is WGL's only steam and chilled water customer.

*Watergate East, Inc. v. Public Service Comm'n*, 662 A.2d 881, 885 (D.C.1995) (citations omitted). With the approval of the Commission, WGL maintains separate rate structures for customers in each of these three categories. Energy bills paid by the petitioners are determined under a WGL tariff known as Rate Schedule W, a schedule specially designed by WGL and approved by the Commission for the Watergate complex. Entitled "Steam and Chilled Water Rates for Service to the Watergate Project," Rate Schedule W will remain in effect until the year 2020.[2]

In December 1992 WGL filed an application with the Commission requesting authori-

---

1. The equipment in Watergate East is operated and maintained solely by WGL personnel. Thus WGL does not sell fuel as such to petitioners; instead, it sells steam and chilled water. Additionally, some of the equipment is owned by some of the petitioners, while some is leased from other sources by WGL, which recovers its rental and other costs in rates paid by the petitioners.

2. Ever since the Watergate was built in 1965, it has been treated as a unique customer of WGL.

ty to increase its rates for gas service throughout the District of Columbia. The application opened a case docketed by the Commission as Formal Case No. 922. In its original request, WGL did not seek any increase in rates for service to the Watergate. Nevertheless, petitioners filed a motion to intervene in Case No. 922, and in its order granting the motion (Order No. 10181), the Commission raised a supplemental issue for consideration: "Is Rate Schedule W and its application by Washington Gas just and reasonable?" In response to that order, WGL proposed a change in Rate Schedule W and filed additional documentation in support of its proposal. On October 8, 1993, after extensive hearings and the filing of post-hearing briefs, the Commission issued Order No. 10307 approving WGL's request for a change. Petitioners moved for reconsideration, which the Commission denied on December 13, 1993, in Order No. 10339. Petitioners then filed the instant petition for review.

The rates authorized in WGL's Rate Schedule W have two components: "demand charges," covering most of WGL's non-fuel operating costs (*e.g.*, service, labor, maintenance, and capital), and "commodity charges," covering the cost of natural gas and fuel oil.[3] At issue in this litigation is the Commission's approval of a new method of calculating demand charges. Formerly, demand charges were set at a fixed dollar amount per unit of natural gas sold. In order to determine from year to year what that dollar amount should be, the Commission utilized a "test year" procedure which served as an annual forecaster of WGL's financial requirements, including a fair rate of return. *See Washington Public Interest Organization v. Public Service Comm'n*, 393 A.2d 71, 74 n. 2 (D.C.1978), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). Briefly stated, the fixed rates for the demand charges were established by dividing WGL's test-year expenses by its test-year sales, thereby producing a per-unit charge for operating costs. This fixed rate was then

adjusted, subject to the Commission's approval, under a series of monthly "escalator adjustments" so that WGL could recover any increases it might have incurred in the cost of such items as gas or fuel oil, electricity, taxes, and labor.

Under the change approved by the Commission, which the petitioners challenge, there is no longer a fixed dollar base for the demand charges; instead, they are determined according to a mandatory pass-through tariff, which enables WGL to recover its actual monthly costs of service and maintenance as they are incurred. In essence, rather than estimating annual demand charges as it did under the test-year method, WGL is now authorized to issue monthly bills to its Watergate customers for its actual operating and maintenance costs as the current month's expenses are recorded in WGL's accounts receivable. Additionally, if WGL should incur extraordinary expenses in a particular month (*e.g.*, repair costs or increased maintenance), the new pass-through tariff is designed to allow the amortization of those costs on an annual (or longer) basis. We note, incidentally, that this pass-through billing structure was approved by the Commission only for WGL's Watergate customers; all other WGL customers continue to be billed according to the test-year method.

In deciding to change WGL's rate design for the Watergate, the Commission gave three reasons. It concluded, first, that the staffing levels and maintenance costs under the new rate design were reasonable; second, that WGL had met its burden of proving that it was prudently managing the Watergate's energy facility; and third, that the new pass-through rate design would allow WGL to recoup the actual personnel and maintenance costs of the Watergate energy facility, which, according to the record, is aging and becoming increasingly more expensive to maintain. In addition, the Commission noted the unique billing and service relationship between WGL and the Watergate.[4]

---

3. For a review of the rate history of WGL and its Watergate customers, *see Watergate Improvement Associates v. Public Service Comm'n, supra*, 326 A.2d at 781–783.

4. Petitioners contest the accuracy and relevance of the Commission's assertion that the service and billing relationship between WGL and its Watergate customers is unique. This court rec-

Under the new billing structure, WGL's Watergate customers will face a twenty-five percent increase in the demand charges portion of their monthly energy bills. Although neither the record nor the briefs of the parties convert this percentage into an actual dollar figure, it appears that this increase will enable WGL to avoid the revenue deficits it has suffered in the recent past from the operation of its Watergate facility, which during fiscal 1992 amounted to $721,880.

## II

█ In fulfilling its rate-making responsibilities, the Commission is required to "arriv[e] at a fair balance between competing consumer and investor interests." *People's Counsel v. Public Service Comm'n*, 399 A.2d 43, 45 (D.C.1979). If we conclude that the Commission has done so, and if there is substantial evidence in the record to support the Commission's findings, this court must affirm its rate determinations. *Office of People's Counsel v. Public Service Comm'n*, 482 A.2d 404, 407 (D.C.1984); *Potomac Electric Power Co. v. Public Service Comm'n*, 402 A.2d 14, 17 (D.C.) (en banc), *cert. denied*, 444 U.S. 926, 100 S.Ct. 265, 62 L.Ed.2d 182 (1979). By statute, this court's review of Commission decisions is restricted to "questions of law, including constitutional questions; and the findings of fact by the Commission shall be conclusive unless it shall appear that such findings of the Commission are unreasonable, arbitrary, or capricious." D.C.Code § 43–906 (1990). "It is the Commission, not this court, which has the responsibility for setting utility rates and establishing rate designs." *People's Counsel v. Public Service Commission*, 472 A.2d 860, 862 (D.C.1984) (citations omitted). Thus the court may not substitute its judgment for that of the Commission. Indeed, as this court has remarked on several occasions, our review of utility raté decisions by the Commission "is the narrowest judicial review in the field of administrative law." *Potomac Electric Power Co. v. Public Service Comm'n, supra*, 402 A.2d at 17.

█ Within these general principles, there is a special rule that applies to cases such as this one. That rule, simply stated, is that "[t]he Commission may not depart from its own established policy without providing a reasoned explanation for doing so." *Office of People's Counsel, supra*, 610 A.2d at 247 (citation omitted); *accord, Office of People's Counsel, supra*, 482 A.2d at 414–415 ("[w]hen an agency departs from a settled practice or rule, it has a special duty to explain the reasons for that departure"). A leading case in this area is *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 444 F.2d 841 (1970), *cert. denied*, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971). In *Greater Boston* the court declared:

> An agency's view of what is in the public interest may change, either with or without a change in circumstances. But an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored....

*Id.* at 394, 444 F.2d at 852 (footnotes omitted). If a reviewing court is satisfied that the agency has provided such a "reasoned analysis," so that "the agency's path may reasonably be discerned," the court will affirm the agency's decision. *Id.* at 393, 444 F.2d at 851 (footnote omitted); *see Office of People's Counsel, supra*, 610 A.2d at 247–248; *Office of People's Counsel, supra*, 482 A.2d at 414–415.

The Commission's rationale for approving a change in rate design from a test-year method to a pass-through method was threefold. It concluded that the staffing levels and maintenance costs under the new rate design were reasonable, that WGL had adequately shown that it was prudently managing the Watergate's energy facility, and that the new rate design would allow WGL to recoup its actual staffing and maintenance costs for the Watergate. As a subsidiary reason supporting the change, the Commission said that the unique billing and service relationship between WGL and its Watergate customers would be better managed under

---

ognized many years ago, however, that the relationship between the two is indeed unique and requires a separate rate schedule and on-site

services. *Watergate Improvement Associates v. Public Service Comm'n, supra*, 326 A.2d at 781–782.

the new pass-through rate design. The Commission viewed this approach as reasonable and necessary to allow WGL to recover its actual cost of servicing the Watergate complex, given the unplanned and unpredictable repair and maintenance costs associated with the Watergate system. Petitioners' main argument in this court is that these reasons were either factually erroneous or irrelevant.

## A. *Staffing, Maintenance Costs, and Management*

■ Petitioners assert that the energy facility at the Watergate is overstaffed by WGL personnel and is not prudently managed. In so contending, however, petitioners fail to take into account the uniquely complex operation of the Watergate facility. Gary Cooney, the supervisor of WGL's marketing department, testified before the Commission that, in addition to monitoring the operation of the Watergate plant, the WGL employees who work at the Watergate are obliged to engage in continuous maintenance, both remedial and preventive, of the equipment there.

It is evident from the record that much of the equipment at the Watergate facility is aging and that access to it is restricted by its large size in a relatively small area. Since most of this equipment has already reached or exceeded its median service life, enhanced maintenance is necessary to keep it in operation. Were these maintenance levels to be reduced, the operational life of the equipment would be dramatically shortened, resulting in a deterioration of services or, in some instances, power outages.

Because the facility is in continuous operation, and because no power outages can be allowed to occur, the Commission found that, at a minimum, seven WGL employees were needed to perform effectively the necessary monitoring and maintenance duties. As the Commission noted in its initial order (No. 10307), keeping seven staff members available or on call at the Watergate alleviates personnel shortages due to illness or authorized vacation leave. Additionally, because these staff members must have special training and qualifications to operate the plant's obsolescent equipment, obtaining a substitute maintenance worker on short notice is not a feasible option. Thus the Commission found that current staffing levels at the Watergate facility were reasonable. We cannot say, given the record before us, that this finding was erroneous.

Petitioners also complain about additional labor costs resulting from WGL's occasional reliance on outside contractors to repair and maintain the Watergate facility. The record shows, however, that such expenditures have been authorized only when the required expertise was not available in-house, and that in dealing with outside contractors WGL was careful to control its costs. Thus, given the need to keep the Watergate facility in continuous operation, we see no basis for reversal in WGL's use of such contractors.

Moreover, as the Commission noted in both of its orders, WGL conducted in-depth studies of the actual costs involved in running the Watergate facility. At the hearing before the Commission, WGL presented the testimony of an outside management consultant, Ben J. Mescher, the chief executive officer of an energy facility in Pennsylvania. Mr. Mescher had made an extensive survey of the way in which WGL managed the costs it incurred in operating the Watergate facility. In conducting his survey, Mr. Mescher met with plant managers and supervisors, reviewed the daily log sheets detailing plant maintenance, and made his own on-site inspection of the plant. He concluded that, given the severely limited accessibility of plant equipment to maintenance personnel and the age and decreased efficiency of the equipment itself, as well as the need for enhanced maintenance in order to keep the facility in continuous operation, the costs incurred by WGL in maintaining the plant were not out of line. Thus the Commission found that WGL's staffing and maintenance costs were reasonable, and that it had demonstrated its prudence in managing the Watergate facility. Mr. Mescher's testimony provides ample support for this finding.

## B. *Economic Justification*

■ Petitioners next contend that the Commission's decision to change the design

of Rate Schedule W to a cost-of-service pass-through tariff was inappropriate because there was no economic justification for the use of a separate rate methodology for the Watergate complex. The record shows otherwise.

In both of its orders, the Commission noted that under the former rate design, WGL's income from its Watergate customers during the 1992 fiscal year was approximately $721,-880 less than the cost of providing energy services to the Watergate complex. Such deficits must ultimately be borne by WGL's firm gas customers. Under the new pass-through rate design, however, WGL can now recover from its Watergate customers the actual cost of energy services provided to them. Thus petitioners are mistaken in asserting that the new rate design will cause the Watergate customers to "subsidize" WGL's service to firm gas customers; on the contrary, it will eliminate subsidization of Watergate customers by firm gas customers. While the new rate design will not recoup past revenue losses,[5] it will enable WGL to avoid future deficits and to recover the costs of providing energy services to the Watergate each month as they are incurred. *See* Order No. 10307 at 205 ("the change in rate design proposed by [WGL] is intended to accurately assess the costs of the Watergate service to keep revenues current with those costs").

Additionally, under the new rate design, WGL's need for frequent applications to the Commission for formal rate change orders is eliminated because fluctuations in the cost of service and maintenance may now be billed directly to WGL's Watergate customers on a monthly basis. At the same time, the new rate design provides for amortization of large expenses over a period of up to two years. It also requires WGL to submit a detailed analysis of its costs annually to the Commission, as well as to petitioners, and authorizes petitioners to bring to the Commission's attention any future concerns regarding WGL's monthly invoices. Thus the new rate

design has built-in protections against erratic or arbitrary rate increases.

For these reasons we conclude that the economic justification for the new billing structure set forth in the Commission's orders is fully supported by the record.

## III

■ Petitioners also maintain that the approval of the new pass-through rate design was contrary to the Commission's own criteria for evaluating rate design changes. According to petitioners, the Commission normally insists that marginal cost analyses and elasticity studies be conducted before it will approve any changes in a rate design. In this case, however, petitioners assert that no such studies were conducted and that the Commission admitted it was hampered by their absence. Petitioners contend that the lack of such studies rendered the Commission's decision arbitrary and capricious, and therefore reversible under D.C.Code § 1–1510(a)(3)(A) (1992).

We cannot consider this argument because it was not made to the Commission in petitioners' application for reconsideration. D.C.Code § 43–904(b) (1990) provides in part:

No public utility or other person or corporation shall in any court urge or rely on any ground not so set forth in said application [for reconsideration].

Petitioners' failure to raise this issue before the Commission bars us from considering it now. *See, e.g., Atlantic Telephone Co. v. Public Service Comm'n,* 390 A.2d 439, 444 n. 6 (1978).

## IV

■ Finally, petitioners contend that the new rate design violates the Commission's policy of gradualism in the setting of utility rates, which dictates that utility customers generally should not be subjected to dramatic fluctuations in their rate payments. *See Potomac Electric Power Co.,* 11 D.C.P.S.C. 302, 422 (1990). Petitioners maintain that

---

**5.** Any attempt to recoup past losses through a new rate design for the future would constitute retroactive ratemaking, which is not legally permissible. *See People's Counsel v. Public Service Comm'n, supra,* 472 A.2d at 866.

the Commission ignored this policy when it allowed Watergate customers to be charged twenty-five percent more for WGL's services while other WGL customers are subject to only a two percent rate increase.

 We note again, however, that the oversight and cost control mechanisms which we have described earlier were imposed by the Commission on the new rate design for the specific purpose of guarding against excessive rate increases. We also observe (as did the Commission in its findings) that in addition to its policy of gradualism, the Commission was also required to consider the very large revenue deficit—$721,880 in fiscal year 1992—which the evidence showed was directly attributable to the Watergate facility.[6] *See Washington Gas Light Co. v. Public Service Comm'n,* 450 A.2d 1187, 1202–1208 (D.C.1982) (Commission must consider relevant factors other than its policy of gradualism when setting utility rates). The Commission points out in its brief, and we certainly agree, that "gradualism is but one of many factors to be considered and weighed by the Commission" in determining rate designs, and that principles of gradualism cannot be allowed to "trump[ ] all other valid ratemaking concerns such as ensuring that Watergate and all other customer classes pay a fair share of WGL's costs of serving them." The record in fact shows—for example, in the testimony of Richard Garner, WGL's director of rates and regulations—that the Commission was concerned about the need for gradualism and that it refrained from allowing even greater increases for that reason. Finally, we note that the rate increase to be paid by WGL's Watergate customers will cover only those services supplied to the Watergate complex.

We conclude, therefore, that the Commission did not improperly disregard its policy of gradualism in setting the new rate design. It merely recognized that, in this particular case, the need for gradualism was largely outweighed by other considerations, includ-

ing the need to ensure that WGL's Watergate customers will pay their fair share of utility costs. It also built into the new rate design several mechanisms intended to guard against abrupt or arbitrary rate increases. The balancing of all these factors against one another is entrusted to the sound discretion of the Commission. We cannot say that its discretion was abused or that its decision was unreasonable.

V

Given the Commission's broad discretion in the setting of utility rates, and given this court's very narrow scope of review, we hold that the Commission's adoption of a new rate design for its Watergate customers is fully supported by the copious record before us. We are also satisfied that the Commission has provided the "reasoned explanation" required by the case law [7] when it departs from prior established practice or principle. The Commission's decision is therefore

*Affirmed.*

---

**6.** For example, WGL witness Gary Cooney testified that WGL had extraordinary maintenance costs at the Watergate in 1991 and 1992 ($285,-800 for the two years) that it did not incur in 1988, 1989, and 1990.

**7.** *E.g., Office of People's Counsel, supra,* 610 A.2d at 247.